UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

GUTHRIE MICHAEL NANCE,           )
                                 )
                    Plaintiff,   )
                                 )
          vs.                    )     3:15-cv-00073-RLY-MPB
                                 )
IRA E. CLARK DETECTIVE AGENCY,   )
INC.,                            )
                                 )
                    Defendant.   )

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Guthrie Michael Nance, is a former employee of Defendant, Ira E. Clark

Detective Agency, Inc. ("Clark Security").  He alleges his termination was the product of

age discrimination, in violation of the Age Discrimination in Employment Act, 29 U.S.C.

§ 621 *et seq.*, and disability discrimination, in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as amended by the ADA Amendments Act of

2008 ("ADAAA").  He further alleges Defendant interfered with his right to take medical

leave under the Family Medical Leave Act ("FMLA").  Defendant now moves for

summary judgment.  For the reasons set forth below, the motion is **GRANTED**.

## I.      Background

### A.      Clark Security

Clark Security provides security guards and services for clients in Indiana, Illinois,

Kentucky, and Tennessee.  (Filing No. 29-21, Deposition of Guthrie Michael Nance

("Plaintiff Dep.") at 53-54).  Between June 2012 and January 2013, the company's

1

management consisted of Richard Curby, the sole owner and President; Christy Brake, Corporate Office Manager; and Jeff Arntz, Director of Security. (Filing No. 29-22, Deposition of Richard Curby ("Curby Dep.") at 9). Plaintiff and Mike Minton were managers who reported to Arntz, and Lesa Osborne served as Director of Human Resources. (*Id.* at 9-10).

Most Clark Security employees are over 40 years old. (*Id.* at 6). Curby was 79; Arntz was 53; Osborn was 61; Plaintiff was 59; Minton was 66; and Brake was 40. (*Id.* at 4; Plaintiff Dep. at 49; Filing No. 29-23, Deposition of Jeff Arntz ("Arntz Dep.") at 7; Filing No. 29-2, Affidavit of Mike Minton, Ex. 2; Filing No. 29-24, Deposition of Lesa Osborne ("Osborne Dep.") at 4; Filing No. 29-25, Deposition of Christy Brake ("Brake Dep.") Dep. at 4).

### B. Plaintiff's Employment

Plaintiff began his employment at Clark Security as a security officer in October 2002. (Plaintiff Dep. at 54-55). His resume included "over 25 years of law enforcement experience, over 35 years of firefighter experience, 7 years of EMS, and 4 years general security as supervision [sic]." (Filing No. 29-3, Plaintiff's Resume).

In 2008, Curby promoted Plaintiff to Field Operations Manager, a salaried position. (Plaintiff Dep. at 75-76). In that role, he and Minton helped supervise and train security officers, traveled to sites to perform inspections, and ensured each site had the necessary supplies and paperwork. (Filing No. 29-4, Plaintiff's Job Description; Arntz Dep. at 43-44). Nance and Minton were "the link of communication" between the company's employees in the field and the corporate office. (Plaintiff Dep. at 240-45).

Plaintiff attended management meetings on Friday mornings at Clark Security's headquarters in Evansville, Indiana, but otherwise traveled from his home office in Beaver Dam, Kentucky to security sites in Kentucky, Tennessee, and Illinois. (*Id.* at 112; Arntz Dep. at 36). Minton operated out of Clark Security's Evansville office and worked during the day. (Arntz Dep. at 43-44).

In approximately May 2012, Plaintiff served as interim Director of Security following the termination of the previous director, Thomas Ruck. (Plaintiff Dep. at 91). Plaintiff did not want the position permanently because he "like[d] being out and moving around and doing what needed to be done out here at these different locations, different sites." (*Id.*).

**C.     Jeff Arntz, Director of Security**

In June 2012, Curby hired Arntz to replace Ruck as Director of Security. (*Id.* at 90; Curby Dep. at 21). Plaintiff described the company as being in a "stalemate" when Arntz was hired because it "wasn't gaining any new employment, wasn't gaining any new job sites." (Plaintiff Dep. at 116). To break this stalemate, Arntz began visiting and assessing every client site and working with Plaintiff and Minton on an "idea sheet" of 39 possible improvements for the company. (Arntz Dep. at 38-39). Arntz's ideas included, but were not limited to, publication of a company newsletter, instituting a safety reward program, and improving communication between sites and company management, especially regarding personnel matters. (*Id.* at 125; Curby Dep. at 23, 25). Osborne testified:

> [Arntz] spent about a month observing how we did things. We had a major meeting early in July. He did a Powerpoint presentation. Had handouts of how we were going to do this. It was very exciting. I can't tell you details at [this] point. Asked us all to buy in, and if we could not buy in, to let him know now because we were going to have to – he would have to address that as well. And he was – it was pretty exciting. Recognition for employees in it. Advancement opportunities for our uniformed officers. He was developing a training team of out of [on-site supervisors] that had had successful posts. There was quite a bit of excitement from not just those of us in the corporate office . . . .

(Osborne Dep. at 49-50).

Most of the management team supported Arntz's ideas. (Curby Dep. at 23, 25; Brake Dep. at 27-28; Osborne Dep. at 50 ("Q: So everybody was on board with this? A: I can't say everybody was. The people I spoke to were.")). Plaintiff was not as supportive. With respect to the 39-topic idea sheet, Arntz testified:

> At that point [Plaintiff's] [sheet] just about had 39 negative comments on that form. Everything that we were going to try to do he didn't believe could be done, and at that point I counseled [Plaintiff] several times verbally. We had discussions and he just never wanted to seem to go in the direction that the president wanted the company to go.

(Arntz Dep. at 39; *see also* Plaintiff Dep. at 115 ("[W]hen [Arntz] brought some of these things up . . . I told him, I said, look, man. This has already been tried. But I said, let me print off what I said and where I presented it and how I presented it so that you can have an idea of where I went.")). Plaintiff thought Arntz was "green behind the ears. He didn't know what it was to be running a security agency. . . . But he's in charge. It's his decisions." (Plaintiff Dep. at 103-04).

In mid-November 2012, Curby asked Plaintiff to assist Arntz in reaching his goals. (*Id.* at 124, 234). Plaintiff described the conversation as follows:

> [Curby] said that Arntz needs some help, and he's been complaining that he has not been getting enough help out of you. He said, would you just please try to help him and help him along in any way you can. My response was that, boss, I am doing everything I can for him, but I can't reinvent the wheel.

(*Id.* at 124).

### D. Plaintiff's Back Injuries

Plaintiff injured his back while working from home on September 24, 2012, and injured it again when he slipped and fell at a client site on October 19, 2012. (*Id.* at 184; Filing No. 29-12, Dec. 14 Memo). In October 2012, Plaintiff told Osborne and Brake about his back injury in Brake's office. (Plaintiff Dep. at 184). He also apparently told others in the office. (*Id.* at 125). Plaintiff described his injury at that point in time as "a joking matter." (*Id.*). He testified: "We had actually laughed about it and some of them even laughed and said, you know, we're going to have to get you a cane." (*Id.*; *see also id.* at 184 ("We were just laughing about it and, you know, talking about it.")).

### E. Arntz's Alleged Discriminatory Comments

At or around the October 2012 time frame, Arntz told Plaintiff he was "too old to be out here trying to run up and down the road and do these other things and run all these security sites. You can't keep up with the pace that I expect . . . ." (*Id.* at 126; *see also id.* at 113-14). Arntz also told Plaintiff that Minton "was too old to be doing the type of job that he expected him to be doing." (*Id.* at 24-25). Plaintiff never informed Curby nor Osborne about Arntz's "ageist" comments. (*Id.* at 25, 26, 125, 145). And Arntz never commented to either Curby or Osborne about Plaintiff's age or alleged disability/back injury. (Curby Dep. at 28-29; Osborne Dep. at 40).

**F.    Performance Improvement Plan**

According to Curby, Arntz informed him that he wanted to place both Plaintiff and Minton on a Performance Improvement Plan ("PIP"). (Curby Dep. at 30). Curby said, "[G]o ahead and do it if he thought it would make them better officers – more valuable to the company and better employees." (*Id.*). Arntz testified, however, that the only employee he placed on a PIP was Plaintiff. (Arntz Dep. at 48).

On November 30, 2012, Arntz and Osborne met with Plaintiff and informed him that he was being placed on a five-week PIP. (Plaintiff Dep. at 128-29; *see also* Filing No. 29-9, PIP). The PIP begins:

> During the past five months, it has become increasingly evident to me and my superiors that you have not been performing your assigned work in accordance with what is expected of you based on the goals set by Clark Security. On five different occasions you and I have discussed the goals of [] Clark Security and the Operations Department and what I expect from you. To date you have made no significant improvement in the way you conduct business nor have you sufficiently assisted me in taking this company in the direction the President wants it to go. Clark Security values you as an employee and it is my intention to make you fully aware of this situation and assist you in improving your work performance.

(PIP at 1). Plaintiff admitted that, prior to the PIP, Arntz had talked with him "on multiple occasions" about the company and what Arntz expected from him. (Plaintiff Dep. at 131). The PIP identified four areas of improvement: Communication, Site Visits, Training, and Goals, and set specific deadlines for certain tasks. (PIP at 1-2). It also informed Plaintiff that Arntz would be reviewing his performance with Curby each Friday after the company staff meeting, and warned him that "[i]f any portion of this improvement plan is violated at any time during the specified timeframe, disciplinary

6

action to include separation from the company may occur." (*Id.* at 2). At some point after the meeting, Plaintiff met with Curby two or three times stating that "he didn't understand what Mr. Arntz wanted, and [he] told him to go down there and ask him to explain it." (Curby Dep. at 33). He also told him to focus on what Arntz was telling him to do and "do it. . . . Go along with it." (*Id.* at 36).

The portion of the PIP that created issues with Plaintiff was the requirement that he prepare lesson plans to help train security officers. (*See* PIP at 2). Plaintiff informed Arntz that the company already had training materials, and "handed him the book that had . . . all the lesson plans for our complete training library." (Plaintiff Dep. at 121). Arntz explained that the training materials were generic and outdated. (Arntz Dep. at 65). Arntz believed that some sites needed specific training tailored to their unique mission, and wanted Plaintiff and Minton to assist him in creating training materials for those sites. (*Id.* at 64-68).

On December 5, 2012, Plaintiff sent two memos to Arntz, and carbon copied Curby and Brake. (*See* Filing No. 41-7, Dec. 5 Memo; Filing No. 41-8, Second Dec. 5 Memo). In the first, he complained that he did not have time to complete a training plan as required by the PIP because it broke "into the work time I'm required to be in the field and making rounds to the sites." (Dec. 5 Memo). He also informed Arntz that "[a]ll teaching materials are on hand and have been provided and prepared by professionals that do just this type of preparation." (*Id.*). In the other December 5 memo, Plaintiff complained that he "simply [didn't] know what [Arntz] want[ed] in regards to a training plan" and requested "a sample of what you are asking for." (Second Dec. 5 Memo).

Plaintiff admitted that Arntz provided him with a template of a training plan to assist him.

(Plaintiff Dep. at 149).

On December 12, Plaintiff sent yet another memo, which stated:

Having not heard from you on the progress plan I need a directive!  On October 23, 2012 CEO Richard Curby said he wanted me out there visiting the sites and working at night.

As I have asked you in person and not been given any answer!  I either take the time at home and work on the material or I'm out on the street doing what the owner has directed me to do.  If you want the plan finished then you must take the responsibility of taking me away from my duties.

So my question is which is it and if I'm not on the street are you going to stand up and take responsibility for the action?  I request a response in a timely manner.

(Filing No. 41-9, Dec. 12 Memo).  Plaintiff and Arntz also discussed this

"conflict" between the performance of his work duties and the completion of the

PIP.  (Arntz Dep. at 73).  Plaintiff told Arntz he worked for Curby, and not for

Arntz.  (*Id.*).  Arntz corrected Plaintiff, informing him that he worked for him

[Arntz].  (*Id.* at 73-74 ("My response was that Mr. Curby advised me that

[Plaintiff] worked for me, and that's what that organization sheet was written for

when I first came on board.")).

On Friday, December 14, 2012, Plaintiff sent Osborne a memo stating that the

condition of his back had gotten worse, but that he was able to complete his job duties.

(Dec. 14 Memo).  Osborne immediately emailed him the following Monday morning,

stated she was unaware he had injured himself, and asked him to complete a First Report

of Injury for purposes of notifying the company's workers compensation[1] insurance carrier. (Filing No. 29-13, Dec. 17 Email).

Also on December 14, 2012, Arntz emailed Plaintiff about his progress under the PIP and complimented him on his improved communication. (Filing No. 29-11, Dec. 14 Email). Arntz warned Plaintiff, however, that he was deficient in other areas of the PIP, including preparation of the lesson plans, as well as completing his written goals and weekly summaries of work activities. (*Id.*). Arntz gave Plaintiff an additional week to complete the assignment due on December 7, 2012, and told him to "get the stuff that is late turned into [him]." (*Id.*). At his deposition, Plaintiff denied receiving Arntz's email. (Plaintiff Dep. at 148-50).

### G. Plaintiff's Discharge

Arntz sent weekly memoranda to Curby detailing Plaintiff's progress, and lack of progress, under the PIP. These memoranda, dated December 7, 14, 21, 28, 2012, and January 4, 2013, show that Plaintiff either completed assignments late, or failed to complete them at all. (Filing No. 29-14, Weekly Memoranda). Plaintiff admits that "some of the documents may not have reached the office or Mr. Arntz in the deadline time. . . ." (Plaintiff Dep. at 235-36).

Curby met with Arntz and Osborne about Plaintiff's failure to follow the PIP. (Curby Dep. at 42-43; Arntz Dep. at 91-92, 100-01). Neither Arntz nor Osborne had the authority to fire an employee. (Curby Dep. at 48, Arntz Dep. at 31; Osborne Dep. at 10,

---

[1] Plaintiff has received worker's compensation benefits on a weekly basis since his discharge. (Plaintiff Dep. at 190, 196).

33, 61).  After a discussion between the three, Curby made the decision to terminate

Plaintiff.  (Osborne Dep. at 61; Arntz Dep. at 92).  In making his decision, Curby relied

on Arntz's comments and also Plaintiff's failure to follow Curby's instruction to

complete the PIP.  (Curby Dep. at 42-44).  Curby testified:  "I said, well, if he's not going

to conform, you know – and I've asked him to do it, and he refused to do it, you know,

the only thing we can do is terminate him. . . .  That was the final straw."  (*Id*. at 43-44).

On Friday, January 11, 2013, Plaintiff arrived at Clark Security's office for the

Friday morning management meeting.  (Plaintiff Dep. at 153-54).  Arntz and Osborne

met with Plaintiff and informed him he was being discharged for failing to complete the

tasks and meet the goals set forth in the PIP.  (*Id.*).  They also provided Plaintiff a

termination letter signed by Curby, Arntz, and Osborne, outlining the same.  (Filing No.

29-15, Discharge Letter).

Before leaving Clark Security, Plaintiff submitted five lesson plans to Arntz.

(Filing No. 29-16, Lesson Plans).  Plaintiff claims they were timely because Arntz gave

him an extra week to complete the PIP.  (Plaintiff Dep. at 160).  The document he cites

for that proposition is the December 14 email he claims he never received.  (Id. at 160-

61; Dec. 14 email).

**H.    Doctor's Note**

On January 10, 2013, just a day before his discharge, Plaintiff saw a doctor for the

first time regarding his alleged back injury.  (Plaintiff Dep. at 178).  Plaintiff did not

mention this appointment or his back condition to anyone at Clark Security on the day of

his discharge.  (*Id*. at 153-54, 253-54).  After leaving the company's offices following his

discharge, however, Plaintiff faxed the doctor's note to Clark Security from his home, which stated he was under a doctor's care and totally incapacitated from Thursday, January 10, 2013, until Monday, February 11, 2013.  (Filing No. 29-17, Doctor's Note).  Through discovery, Plaintiff's doctor produced another note dated the same day, January 10, which certifies Plaintiff could report to work without restrictions.  (Filing No. 29-18, Doctor's Note).  Plaintiff testified he never received the second doctor's note.  (Plaintiff Dep. at 263-64).

## II.     Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving it might change the outcome of the case under the governing law.  *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992).  A

factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of that party. *Anderson,* 477 U.S. at 255.

## III. Discussion

### A. Timeliness of Plaintiff's EEOC Charge

Defendant first argues that Plaintiff's age and disability claims must be dismissed for his failure to exhaust his administrative remedies.

Generally, a claim alleging age or disability discrimination may not be filed in district court unless the plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the allegedly unlawful employment practice. *See* 29 U.S.C. § 626(d)(1); *Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 603 (7th Cir. 2014) (age discrimination); *EEOC v. N. Gibson Sch. Corp.*, 266 F.3d 607, 617 (7th Cir. 2001), *overruled on unrelated grounds by EEOC v. Waffle House*, 534 U.S. 279 (2002) (age discrimination); *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 574 (7th Cir. 1998) (disability discrimination). "In deferral states, which have state agencies authorized to remedy age discrimination, a 300-day filing limit prescribed by Title 29

United States Code, Section 626(d)(2) applies and claimants are required to file with the appropriate state agency before turning to the EEOC." *Parker v. Horseshoe Hammond, Inc.*, No. 2:04-cv-33 PS, 2004 WL 1662291, at *2 (N.D. Ind. July 15, 2004) (citing *Oscar Mayer & Co. v. Evans*, 441 U.S. 750 (1980)). Indiana is a deferral state with respect to claims of disability discrimination. *See Jenkins v. Ind. Dep't of Child Servs.*, No. 1:14-cv-1520-TWP-DML, 2015 WL 3867737, at *3-4 (S.D. Ind. June 23, 2015). Therefore, Plaintiff had 300 days to file his charge of disability discrimination with the EEOC.

Here, Plaintiff was discharged on January 11, 2013, but he did not file a charge of discrimination with the EEOC until March 3, 2014. (Filing No. 29-19, EEOC Charge). The record indicates, however, that Plaintiff first filed a charge of discrimination with the Indiana Commission on Human Rights ("ICRC") on July 8, 2013. That date is within 180 days of his discharge. According to Plaintiff, and pursuant to a work sharing agreement, his EEOC charge was dual-filed with his ICRC charge, as evidenced by the EEOC charge number stamped on it. (*See* Filing No. 29-6, ICRC Charge). Plaintiff further claims the ICRC made a clerical error and did not send the charge to the EEOC as required, as evidenced by a letter he sent the ICRC on February 15, 2014. (*See* Filing No. 41-16, Letter). Therefore, he claims, his charge was properly filed within 180 days of his termination.

Clark Security contends the court should reject Plaintiff's argument for two reasons. First, Plaintiff failed to submit the work sharing agreement as evidence. Second, the EEOC stamp bears a 2014 cause number. If the charge was dual-filed with the EEOC, the company continues, it should bear a 2013 cause number.

According to the EEOC's official website, a charge filed with an agency like the ICRC is automatically dual-filed with the EEOC if federal law applies. Thus, a claimant "need not file with both agencies." U.S. Equal Employment Opportunity Commission, *Filing a Charge of Discrimination,* https://eeoc.gov/employees/charge.cfm. The reason the EEOC charge bears a 2014 cause number is because the ICRC apparently lost Plaintiff's charge and supporting documentation. (*See* Letter ("I'm providing you with documents and information as I locate it and will forward everything to you. Any assistance is grateful and maybe we can find the file.")). Furthermore, in the EEOC's Dismissal and Notice of Rights, it did not dismiss the charge on timeliness grounds, even though that is one of the stated grounds upon which the EEOC may close a file. (*See* Filing No. 41-17, Dismissal and Notice of Rights). Therefore, the court finds Plaintiff's charge of discrimination was dual-filed with the EEOC on July 8, 2013—within 180 days of his termination. Accordingly, Plaintiff's EEOC charge is timely.

## B. Age Discrimination

In Count III, Plaintiff alleges he was unlawfully terminated because of his age. The Age Discrimination in Employment Act makes it unlawful for an employer to discharge an individual because of his age. 29 U.S.C. § 623(a)(1). Plaintiff presents his case under the direct method of proof, arguing he has a "convincing mosaic" of circumstantial evidence that provides the basis for an inference of intentional discrimination. In *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016), a case decided just a few days after Plaintiff filed his Response, the Seventh Circuit overruled a long line of cases distinguishing between the direct method and indirect methods of

14

proof. *Id.* at 765. Instead, the test "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* The court reasoned: "Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The court clarified that its decision "d[id] not concern *McDonnell Douglas*," and thus, the familiar burden-shifting method remains as a means of assessing circumstantial evidence of discrimination. *Id.* at 766; *see also David v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508,* -- F.3d -- , 2017 WL 129114, at *4 (7th Cir. 2017) (interpreting *Ortiz*).

The parties did not address Plaintiff's claim under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (establishing the prima facie case). The court will therefore consider the evidence as a whole to determine whether a reasonable juror could conclude that Plaintiff would have kept his job if he were younger, and everything else had remained the same. *See Ortiz*, 834 F.3d at 764 (noting the "sole question that matters: Whether a reasonable juror could conclude that Ortiz would have kept his job if he had a different ethnicity, and everything else had remained the same").

Plaintiff's strongest evidence of age discrimination are the statements he alleges Arntz directed at him regarding his age, such as "You are getting too old to do this job." Plaintiff argues Arntz made these statements at or around the time he injured his back.

Plaintiff further alleges Arntz made several comments to him that Minton was too old to do his job.

Arntz did not have the authority to discharge Plaintiff and thus, was a non-decision maker in this case. "Generally speaking, comments by a non-decision maker do not suffice as evidence of discriminatory intent." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 730 (7th Cir. 2004); *see also Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008) (stating that liability attaches where the decision-maker acts for a prohibited reason). Therefore, to survive summary judgment, Plaintiff must show that Arntz had a "singular" influence over Curby and used that influence to cause Plaintiff's termination. *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009); *see also id.* at 453 (stating the cat's paw theory "requires a blind reliance, the stuff of 'singular inflence.'") (quoting *Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 1991)). To prevail under this "cat's paw" theory of liability, Plaintiff must establish that: (1) "[Arntz] actually harbored a discriminatory animus against him; and (2) [Arntz's] input was a proximate cause of [Plaintiff] getting fired." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 604 (7th Cir. 2014). Clark Security can defeat the cat's paw theory by showing that, "even if [Arntz] was biased and attempted to get [Plaintiff] terminated for this reason, the decisionmaker did an independent analysis and came to his own conclusion." *Martino*, 574 F.3d at 452-53.

The court focuses its argument on the second element. The evidence reflects that neither Curby nor Osborne (nor Brake for that matter) had any knowledge of any discriminatory statements made by Arntz to Plaintiff. (Curby Dep. at 28-29; Arntz Dep.

at 46-47; Brake Dep. at 34-35; Osborne Dep. at 39). Indeed, Plaintiff admits he never reported Arntz's ageist comments to anyone at Clark Security, including Curby and Osborne, even on the day of his termination. (Plaintiff Dep. at 125-27, 142-43, 257).

As noted previously, Clark Security's stated reason for Plaintiff's termination was his failure to complete the PIP. The PIP required Plaintiff to complete assignments, such as creating a detailed monthly plan relating to site visits, to complete inspection reports for every site he was responsible for, develop lesson plans for shift change training and classroom training for site visits, and submit short and long terms goals. (PIP at 1, 2). Curby received weekly reports from Arntz on Plaintiff's progress. Those reports did not contain Arntz's subjective assessments or opinions about Plaintiff's performance. Instead, Arntz reported Plaintiff's failure to meet the PIP's deadlines.

Furthermore, Curby did not just consult with Arntz with respect to Plaintiff's performance of the PIP; he also discussed the PIP with Plaintiff and instructed him to work with Arntz to complete it. (Curby Dep. at 36). Curby testified the PIP "should have been something he could do hands down." (*Id.* at 54-55). Curby discharged Plaintiff because he failed to follow through with his specific order to complete it. "That was the final straw." (*Id.* at 42-44).

Lastly, assuming for the sake of argument that Arntz made ageist comments about Minton and placed Minton on a PIP, these facts actually cut against Plaintiff's claim of age discrimination. Minton was older than both Arntz and Plaintiff. And unlike Plaintiff, Minton completed the PIP. (Curby Dep. at 31). The fact that Minton was older than

Plaintiff, but was not discharged, leads to the reasonable inference that Plaintiff was discharged for failing to complete the PIP, and not because of his age.

For these reasons, the court finds Plaintiff failed to submit sufficient evidence to show that Arntz had any undue influence over Curby's decision to terminate Plaintiff's employment. Accordingly, Clark Security's motion for summary judgment on Plaintiff's age discrimination claim is **GRANTED**.

### C.    Disability Discrimination

In Count II, Plaintiff alleges he was unlawfully terminated because of his disability or perceived disability. A prima facie case of disability discrimination requires a plaintiff to show that: (1) he is disabled under the ADAAA; (2) he is qualified to perform the essential functions of the job, either with or without reasonable accommodations; and (3) he suffered an adverse employment action. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). The Act defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 656 (7th Cir. 2009).

### 1.    Disability Discrimination under § 12102(1)(A)

Plaintiff does not identify a major life activity[2] that is substantially limited by his

---

[2] Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

back impairment. This omission is fatal to his claim. *Toyota Motor Mfg. v.* Williams, 534 U.S. 184, 198 (2002) (holding "[i]t is insufficient for individuals . . . to merely submit evidence of a medical diagnosis of an impairment . . . . [T]he ADA requires . . . evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012) (finding plaintiff not disabled because he failed to show his aneurism substantially limited a major life activity).

Moreover, before liability may attach, the employer must have knowledge of the plaintiff's disability at the time of his discharge. *See Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1994). The evidence establishes that Plaintiff hurt his back on September 24 and October 19, 2012. Yet, he admits he joked about it with Brake, Osborne, and others in the office. (Plaintiff Dep. at 125, 184). Although he notified Osborne in a memorandum dated December 14, 2012 of the "continuing problems" associated with his back, he assured her he was "able to conduct [him]self accordingly and complete [his] duties." (Dec. 14 Memo). Plaintiff confirmed that he never missed work because of his injury and he never requested any accommodation. (Plaintiff Dep. at 192-93).

The fact that the company knew of Plaintiff's injury, either because he joked about it with Brake and Osborne, or because he sent Osborne a memo explaining that his back

---

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

condition needed attention, does not mean Clark Security knew he was "disabled" within the meaning of the ADAAA at the time of his discharge.  Merely having a medical condition is not enough.  *Burnett v. LFW, Inc.*, 472 F.3d 471, 483 (7th Cir. 2006) ("[T]he existence of a medical condition does not satisfy the ADA[AA]'s disability standard."). "[A]n employer clearly cannot be penalized for failing to appreciate the gravity of an alleged physical ailment that was not brought to its attention and that did not impede the employee's work performance."  *Robert v. Carter*, 819 F. Supp. 2d 832, 842 (S.D. Ind. 2011).  This is particularly true here, where Plaintiff did not miss a day of work, never requested a reasonable accommodation, and did not provide any medical documentation evidencing any disability until after his discharge.  Indeed, Plaintiff never even informed Clark Security that he was going to the doctor.  For these reasons, Clark Security's motion for summary judgment on Plaintiff's disability discrimination claim is **GRANTED**.

### 2.      Regarded as Disabled under § 12102(1)(C)

Under the ADAAA, an individual need not prove that the employer had knowledge of an actual disability if she can demonstrate that she was subjected to a prohibited adverse employment action because she was "regarded as" having an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to limit, a major life activity. 42 U.S.C. §§ 12102(1)(C); 12102(3)(A); *Jennings v. Dow Corning Corp.,* No. 12-12227, 2013 WL 1962333 (E.D. Mich. May 10, 2013) (employee that was not hired by employer because of employee's

back and shoulder problems, regardless of whether believed to be substantially limiting, "regarded as" impaired).

Plaintiff fails to show that his termination was because of his back injury. As noted above, Plaintiff joked about it, never missed a day of work and never asked for an accommodation. Therefore, Clark Security's motion for summary judgment on Plaintiff's disability discrimination claim under the "regarded as" prong is **GRANTED**.

### D.    FMLA

In Count II, Plaintiff alleges Clark Security interfered with his ability to take FMLA leave and discharged him as a result of his prospective use of such leave. To survive summary judgment, Plaintiff must show: (1) he was eligible for FMLA protection; (2) Clark Security is covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave to Clark Security; and (5) Clark Security denied him FMLA benefits to which he was entitled. *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014). For purposes of this motion, the court addresses only the fourth element: whether Plaintiff provided the company with sufficient notice regarding his "serious health condition."

An employee may take FMLA leave for a "serious health condition," defined as "an illness, injury, impairment or physical or mental condition that involved inpatient care . . . or continuing treatment by a health care provider[.]" 29 C.F.R. § 825.113(a). An employee seeking FMLA leave "must provide h[is] employer with sufficient information to notify them that []he has a serious health condition that requires FMLA protection." *Spurling*, 739 F.3d at 1063. An employer has no duty to investigate whether

an employee has a serious health condition covered by the FMLA. *Id.* "'[U]nless the employer already knows that the employee has an FMLA-authorized ground for leave, . . . the employee must communicate the ground to him; he cannot just demand leave.'" *Id.* (quoting *Aubuchon v. Knauf GmbH*, 359 F.3d 950, 953 (7th Cir. 2004)).

Plaintiff did not put the company on notice of any facts indicating he could have an FMLA-qualifying reason for leave. As stated previously, he joked about his back condition, never missed a day of work, and did not notify anyone from Clark Security that he was seeing a doctor. And in his December 14 memo to Osborne, he reiterated that he was able to work. (Dec. 14 Memo). Therefore, Clark Security's motion for summary judgment on Plaintiff's FMLA claim is **GRANTED**.

## IV. Conclusion

Plaintiff failed to raise a genuine issue of material fact on his age, disability and FMLA claims. Therefore, Defendant's Motion for Summary Judgment (Filing No. 28) is **GRANTED**.

**SO ORDERED** this 14th day of February 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.